378 P.2d 244

Malcolm F. O'DONNELL and Sarah E. O'Donnell, his wife, V. E. Frazier and Allene Lauck, Appellants,

v.

FIRST NATIONAL BANK OF ARIZONA, Appellee.

No. 6855.

Supreme Court of Arizona.

En Banc.

Jan. 16, 1963.

18

Spector & Johnson, Phoenix, for appellants.

J. D. Skeen, Salt Lake City, Utah, and Charles Rogers, Mesa, for appellee.

PHELPS, Justice (Retired).

This is an appeal by defendants from a judgment of the superior court of this county. The cause was tried to the court without a jury. The pleadings were multitudinous. However, a careful analysis of all the pleadings in the case leads us to the conclusion that the action is essentially a quiet-title action and was so considered by the trial court and by the parties litigant.

The trial court rendered a judgment against the plaintiff Isabell Charlton from which she did not appeal and neither she nor her pleadings are before this Court. This leaves the issues created by the pleadings of the intervenor on the one side and the pleadings of the defendants on the other which present the sole issues here for our determination. The trial court rendered judgment for the intervenor and against the defendants from which they appeal as well as from the court's order denying their motion for a new trial.

Where there is no conflict in the evidence the question presented to the court becomes one of law rather than one of fact. This Court under such circumstances has the power to determine as a matter of law whether the deed executed by decedent was valid or whether it was vitiated by any of the defenses set up by the intervenor. See San Diego Trust & Savings Bank v. San Diego County, 16 Cal.2d 142, 105 P.2d 94, 133 A.L.R. 416. We think we would be justified in pursuing that course here. However, we have determined to analyze the evidence to some degree to show that the matters alleged in the intervenor's complaint and found by the court to be facts are not supported by the evidence.

On December 28th, 1954, Electa Skeen Johnson, now deceased, was over 75 years of age living alone in her home in Mesa which had a value of $1,000 or slightly more. She was then suffering from a malignant tumorous growth in both ovaries. On the above date Mrs. Johnson tried to reach Dr. Frazier at his home and through his wife finally succeeded in contacting him. Later Dr. Frazier called at her home and found her in bed in a disheveled room so cold that he was unable to physically examine her. The doctor then called Mrs. Allene Lauck, operator of the Mesa Sanitarium and told her Mrs. Johnson wanted to come to the sanitarium and that she should go and see her. Mrs. Lauck complied with his request and took her first to his office for a physical examination and then to the sanitarium. Up to that date Mrs. Johnson and Dr. Frazier had never met. After examining her Dr. Frazier directed that she be placed in the Mesa Sanitarium. His examination revealed a large tumorous growth in the ovaries and uterus which he feared might be malignant, but because of her age

and physical condition did not think it wise to attempt surgery.

Mrs. Johnson, hereinafter referred to as decedent, informed Dr. Frazier she had no way to pay her medical and hospital expenses except by sale of her home and asked him if he would try to sell it for her. He made some effort to sell it but the welfare department of Maricopa County, from whom she was then receiving $70 per month, demanded that the property be sold for not less than $1,700 cash or else her $70 per month would be cut off. The record discloses no reason for this action. Dr. Frazier was of the opinion that the property was not worth over $1,000 and made no further effort to sell it.

Decedent had asked Mrs. Lauck if she would take care of her during her life in consideration of decedent conveying the property to her. She previously had asked Mrs. Lauck to sell her property or lease it to someone for her. This together with her $70 pension she said would pay her expenses. Mrs. Lauck declined the offers, saying that she knew nothing about real estate and could not handle two businesses. Decedent had sent word to Dr. Frazier to come to see her at the sanitarium. It was at that time that she informed him she wanted to arrange for her medical and hospital care and stated she would convey her home to him in consideration of such service. After discussing the matter with her on several occasions Dr. Frazier accepted

her offer and according to his testimony he said:

"My arrangement was that I would provide her with professional care *to the limit of my personal ability* and that I would arrange with Mrs. Lauck to see that she had room and board for as many days, months, or years as she should survive in the Mesa Sanitarium, * * *." (Emphasis supplied)

Dr. Frazier offered to put the agreement in writing. She jokingly reminded him at the time that he might be stuck as she might live ten years, and the doctor replied that it might be a much shorter time than that, "and I will have the long end of the horn. It is an awkward and unpleasant place for a Doctor to be put, so let's hope you live a long time."

Later, at the request of decedent Dr. Frazier requested Attorney D. O. Brown of Mesa to go to the Mesa Sanitarium and see decedent with the view of having a deed executed by her conveying her home property to Dr. Frazier. Attorney Brown testified he made three trips to see decedent to ascertain her wishes and to have her sign the deed which she did on February 8, 1955, at which time he took her acknowledgement to the warranty deed prepared by him carrying out the agreement between her and Dr. Frazier. Brown told her if she signed the deed she would convey her property to Dr. Frazier. Her reply was that "she under-

stood that; she wanted to do it and [had] thought about it for some time." She said she was going to deed it to somebody else and then in turn it would be deeded to Dr. Frazier. According to Brown, "she appeared to know what she was doing and what she wanted to do".

Brown had previously stated that "She said she wanted to draw up a deed conveying some property she had in Mesa to Dr. Frazier. She stated at that time she was getting all of her affairs in order, that she didn't expect to recover and that she wanted to convey this property to Dr. Frazier for services that he was rendering to her."

There is nothing in the evidence in this case, assuming a confidential relationship did exist between Dr. Frazier and the decedent, from which the court could possibly infer constructive fraud at the time the transaction was entered into.

On separate occasions Dr. Frazier called in two reputable physicians, Dr. Bruce D. Hart and Dr. Ira Bryant of Mesa, for consultation to have them examine decedent to ascertain their opinion on whether surgery was advisable. They were of the opinion that surgery was not advisable because of her age and a weakened physical condition. This was in accord with Dr. Frazier's conclusion.

J. D. Skeen, brother of decedent, came to Mesa around the 8th of February, 1955, and insisted on an operation and that it be done as soon as possible as he had to get back to his business. Dr. Wood was called at the request of J. D. Skeen and recommended surgery which he performed later at the Southside Hospital in Mesa on February 14.

After the operation decedent, at her request, was returned to the Mesa Sanitarium on February 18. She was removed to the Granite Reef Rest Home on March 24 by her sister, Mrs. Charlton with the assistance of the Charltons' attorney, Charles Rogers, without a release from Dr. Frazier and without his consent or the consent of Mrs. Lauck. Decedent passed away at the Granite Reef Rest Home on May 15, 1955.

After Isabell Charlton had filed her quiet-title action against defendants, First National Bank which had been appointed and qualified as administrator of the estate of decedent filed an answer thereto in intervention and set up many defenses against both plaintiff Isabell Charlton and defendants. In its counterclaims and answers to counterclaims it made additional charges of tortious acts by defendants and prayed for judgment in accordance with its prayer in its counterclaim to establish its estate and title to decedent's property. *It did not in any of its pleadings plead a failure of consideration.* It asked that both plaintiff and defendants be forever estopped and barred from having or claiming any right or title to said premises adverse to intervenor. The specific defenses will be hereinafter fully

shown in discussing the trial court's findings of fact and conclusions of law.

Defendants have separately assigned as error all of the findings of facts and conclusions of law set forth in their twelve assignments.

There is no conflict whatever in the direct evidence in this case bearing upon the issues presented here. Therefore, this Court must look to circumstantial evidence, if any, to uphold the judgment of the trial court if it is to be sustained.

It is true that Isabell Charlton, sister of the decedent and Mr. Charles Rogers, one of the attorneys for plaintiff in the case, testified. Nothing was stated, by either of them, however, that refuted or in any way contradicted any material testimony given by any of the witnesses for defendants.

Mrs. Charlton, whose home is in Utah, testified that she and decedent were friendly with each other and that she had visited her sister in Mesa at one and a half to two year intervals since she moved to Mesa in 1921. Mrs. Charlton further stated that she visited decedent in December of 1952 and stayed until February, 1953, the longest period she had ever visited with her. When questioned about this visit Mrs. Charlton explained she (Charlton) had not been well and had come to stay with decedent just to be with her. The inference could · be drawn from this statement that Isabell's visit was for her own benefit rather than to be of comfort to her sister. She also testified that she had not heard about the incident of her brother, J. D. Skeen, coming to see her sister shortly before decedent went into the Mesa Sanitarium. He knocked on her door and told her who he was. Decedent, without even admitting him into her home, told him to "Go away. I don't want to see you." J. D. Skeen did not deny that this incident actually occurred. Charles Rogers did not testify to anything whatever in conflict with the testimony of defendants.

The fact that decedent was suffering from a cancerous tumor of such great size, that it involved both ovaries, filling the lower abdomen and pelvis, and had also spread to a point where the malignancy was apparently affecting the liver, indicates to us as laymen that this growth had existed for some period of time. So far as the record discloses, decedent had not notified her family, including Mrs. Charlton, of either her critical illness or of her financial needs, although badly in need of some assistance with the latter. This speaks rather potently in confirmation of the statements of decedent as attributed to her by Dr. Frazier, Mrs. Ward and Mrs. Lauck, to the effect that, (1) she didn't want her family notified that she was seriously ill; (2) that the only thing they would do would be to cause trouble; (3) that when her brother J. D. Skeen ordered her placed in a private room she said: "she wished that he had left her alone

and let her run her own business and let her live her life out in peace;" and, (4) that when Mrs. Lauck asked her if she wanted to have the operation: "it didn't seem to matter anymore what she thought, that her brother was running her life like he always tried to all her life, and she knew she would die eventually."

In the court's finding of fact No. 1 it was found that Electa Skeen Johnson, prior to the 1st day of January, 1955 was the owner and in possession of:

"The north 80 feet of the south 100 feet of the north 227 feet of Lot 21 of Block 91 of the City of Mesa, Maricopa County, Arizona. According to the plat on file in the County Recorder's office in Docket 13, page 25 thereof. EXCEPT the west 7 feet thereof.

"Said real estate was improved with a dwelling house occupied by Electa Skeen Johnson, and was furnished with necessary household furniture, including a refrigerator, electrical equipment, bedding, bedroom furniture, and a large metal trunk, in which was kept valuable papers and records and other property, the detail description of which does not appeal in the evidence."

Its finding of fact No. 2 states that:

"On or about the 1st day of January, 1955, the defendants, V. E. Frazier and Allene Lauck, after removing the said Electa Skeen Johnson from the said premises in a serious physical and disturbed mental condition to a rest home or private hospital operated by them, entered the said premises and removed all of such furniture, trunk and other personal property from the premises and destroyed or converted the same to their own use and benefit. The court finds the value of said property to be $500.00, and further that said property was removed, destroyed and converted without authority of law, and thereupon the said V. E. Frazier and Allene Lauck became indebted to the said Electa Skeen Johnson in the sum of $500.00."

There is no evidence whatever in the record of the value of the property removed from decedent's home by Dr. Frazier or that it was wrongfully removed. Nor was there any evidence of the value of the contents of the trunk at that time. The only evidence concerning its contents was that a small black box containing $500 in paper money was in the trunk when Mrs. Charlton was visiting with decedent from December 1952 to February 1953. This is, of course, too remote to have any probative value whatever as to the trunk's contents when it was moved out of decedent's house in January or February 1955. There is no evidence of the value of the other property removed at that time except Dr. Frazier's testimony that it did not have a value in excess of $50.

The evidence does disclose that in addition to the property above described there was a sick-benefit insurance policy in favor of decedent with the Pioneer American Insurance Company which was then about to expire. Decedent at a time when Mrs. Ward, then a nurse for Dr. Frazier, was in the sanitarium, called for Mrs. Lauck and asked her to bring decedent a little black box, which Mrs. Lauck held for her. Decedent unlocked the box, took out the insurance papers, relocked it and handed the papers to Mrs. Ward, saying: "Here, Honey, take these over to doctor. If he can get anything out of them, okay. If he can't that will be okay, too; but see if they are any good."

Mrs. Ward testified that when decedent was first brought to the office of Dr. Frazier she said concerning her family:

"I have a family, but you don't need to know about them. * * * I am coming to you to be taken care of, and that is all you need to know."

As she was leaving the doctor's office, decedent asked of Mrs. Ward: "What kind of doctor is this doctor? * * * Do you have confidence in him?" Mrs. Ward answered in the affirmative and decedent then stated: "If his own nurse has confidence that is enough for me. I like him."

Mrs. Ward also related this incident, which occurred during decedent's first week in the sanitarium. Having been summoned to the sanitarium by decedent Mrs. Ward was advised by decedent:

"I want to talk to that doctor of yours. I want an attorney." She continued, "Well, you know I haven't any money; and I want to be taken care of. I want to arrange with an attorney about some property to take care of my bill. I want doctor to be taken care of."

Mrs. Ward was not in the employ of Dr. Frazier when she testified in this case.

The evidence discloses that Dr. Frazier was successful in renewing the sick-benefit insurance policy and collected $660.35 from the Pioneer American Insurance Company on the policy about the time plaintiff brought her action against him. It further shows that he used this money in paying the expenses of the operation forced upon the decedent by her brother.

The record is totally barren of any evidence to the effect that decedent was in a serious mental condition when removed from her home to the sanitarium operated by Mrs. Lauck. On the other hand it completely refutes that fact, as evidenced by the testimony of Mrs. Ward concerning the statements of decedent set out above.

We will defer any further discussion of finding of fact No. 2 as we believe a disposition of assignments of error addressed to finding of fact No. 3 will effectually and effectively dispose of the entire case. Findings of fact No. 3 are as follows:

"3. On the 8th day of February, 1955, the said Electa Skeen Johnson signed an instrument purporting to be a warranty deed conveying the real estate hereinabove described to the defendants, Malcolm F. O'Donnell and Sarah E. O'Donnell, his wife. Said deed was drafted and at the instance and request of the defendant, V. E. Frazier, who thereafter, while the said Electa Skeen Johnson was his patient and under the full *and complete domination and mental control of the said defendants, V. E. Frazier and Allene Lauck, and without any consideration whatsoever moving from the grantees therein,* Malcolm F. O'Donnell and Sarah E. O'Donnell, his wife, *or the said V. E. Frazier* or Allene Lauck, was received by the said V. E. Frazier, was filed for record and recorded in Docket 1577, pages 476–477, records of the County Recorder of Maricopa County, Arizona. *The said deed was drafted and recorded in furtherance of a scheme and design, on the part of the defendants to obtain the real estate described in Finding No. 1, without consideration, and under the circumstances surrounding Electa Skeen Johnson, which did not permit of the exercise of her independent judgment, without independent advise, and the said deed was made to run to the defendants, Malcolm F. O'Donnell and Sarah E. O'Donnell, his wife, in furtherance of said scheme to defraud the said Electa Skeen Johnson of said property.* The court finds that the said deed is void, and that the estate of the said Electa Skeen Johnson is the owner of said property, as against the said defendants." (Emphasis supplied)

During the course of the trial, in response to an argument being presented by counsel for the defense, the court said the following relative to the presence of fraud on the part of Dr. Frazier at the time the contract was entered into with decedent:

"* * * And I am not inferring in any respect that the doctor when this first commenced had any idea of defrauding anybody. I think it was just as honest and honorable a deal as any man could make across the board; *and I find no fraud,* except I do think there is a failure of consideration." (Emphasis supplied).

"Now, I am keeping an open mind; and I want the doctor to try to explain these things, why these letters were written and why he changed his position."

The law is as stated in Dingler v. Ritzius, 42 Idaho 614, 247 P. 10, 49 A.L.R. 598, to wit:

"Subsequent events as the early death of the mother cannot enter into the fairness of the contract or the adequacy of the consideration in this class of contracts, as there is an element of

uncertainty, or an uncertain time for the maintenance of the performance, and the adequacy of the consideration and the fairness of the contract must be viewed from the standpoint of the time of its making."

And in Tunks v. Vincent, 241 Ky. 379, 44 S.W.2d 282, in a similar case the Court said:

"The fairness of this transaction is beyond question. No one could tell how long the grantor would live, and the probable burden assumed by the grantee is not to be measured by what subsequently transpired, but by the situation at the time of the transaction."

We do not think the transaction in this case is unconscionable or that the consideration can be said to have failed in any sense of the word. In the case of In re McGee's Estate, 46 N.M. 256, 127 P.2d 239, an elderly woman suffering advanced stages of cancer died approximately two weeks after she conveyed her property valued at around $7,000 to close friends in consideration of their care of her for life. And in Howe v. Watson, 179 Mass. 30, 60 N.E. 415, the grantor 85 years of age died 38 hours after his sister began to care for him under a contract to take care of him during his life in consideration of his conveying property to her in the sum of approximately $6,000. The court upheld this upon the grounds above stated. These cases were actions for specific performance of a con-

tract. In the instant case decedent had fully performed which strengthens defendants' position.

It is apparent from the comment of the learned trial judge that he wanted Dr. Frazier to explain certain letters he had written to the decedent's brother after the contract was consummated between Dr. Frazier and decedent. One letter bearing a date of March 14, 1955, advised Skeen among other things that he *"had a fee that was continuing to grow."* Another letter, dated February 24, 1955, itemizing the unpaid bills, including the operation and hospitalization in the Southside Hospital, was written in response to a request of Skeen to furnish an itemized statement. We believe the consideration of these letters by the learned trial judge constitutes the basic error which led him astray.

Even if we assume that the doctor's letters of February 24 and March 14 were written with the purpose of getting a fee from Skeen in addition to having been paid therefor in full by decedent, by no stretch of the imagination, nor by the application of any law with which we are familiar, can we say that such act or acts vitiated and rendered invalid Dr. Frazier's contract with decedent. Skeen was a total stranger to that contract which had been fully executed by decedent by her signing and delivery of her deed of February 8 and Dr. Frazier was then fully performing his part of the contract.

Even if the law were not as above quoted, it could not affect the validity of her deed to defendant Frazier. The only remedy of Skeen under such circumstances would be an action against the doctor to recover the sum of $100 paid him for such services based upon fraud and deceit. It would serve no useful purpose to try to understand why Dr. Frazier would say "that his fee was continuing to grow" when as a matter of fact he had been fully paid for all of his services rendered and to be rendered for the reasons above stated. Whatever his purpose may have been it did not and could not effect the relation between him and decedent under his previous contract with her, to which contract Skeen was not a party and which the trial judge described during the trial as an honest transaction, free from fraud.

There is yet another reason why the defense of failure of consideration was not available to the intervenor. It had not pleaded failure of consideration. The only person who pleaded a failure of consideration was the plaintiff and as above stated, neither she nor her pleadings are before the Court.

We have read and reread the transcript of the evidence and the deposition of Dr. Frazier and we can find no direct evidence whatever even tending to prove fraud, duress, undue influence *or a failure of consideration. Nor can we find any evidence that the decedent was under the complete control or domination, or under any domination or control of Dr. Frazier and nurses at any time, or that she was incompetent or without capacity to execute said deed by reason of such control or domination, or that the procurement of said deed of conveyance was part of a scheme or design to defraud decedent out of her property, and there is no circumstantial evidence at the time the transaction took place to support such claims or any of them.*

On the contrary, all of the evidence is to the effect that decedent was a strong-minded, educated and highly intelligent woman possessing a Bachelor of Arts Degree from the University of Utah, with a background of many years of teaching and travel and she knew exactly what she wanted, which was to be freed of all financial responsibility during the remainder of her life in order that she might have peace of mind. She believed an assurance that she would receive adequate medical care and treatment by Dr. Frazier, then ably aided by Mrs. Lauck, for the remainder of her life. Both of these people were trained to minister to the physical needs of one in her situation. She aggressively sought such an agreement with both Mrs. Lauck and Dr. Frazier. The circumstances surrounding the agreement and execution of the deed between decedent and Dr. Frazier in our view corroborates rather than discredits the testimony of de-

fendants' witnesses relating to said transaction.

We, therefore, hold there was no fraud, duress or undue influence or lack of capacity on the part of decedent to understand the nature of her act in executing the deed conveying her property to the O'Donnells for the use and benefit of Dr. Frazier; that there was a good and valuable consideration therefor in the services performed and to be performed by Dr. Frazier and said deeds conveyed a valid fee simple title in and to said property to Dr. Frazier and that he is the owner thereof.

■ The evidence further shows, without any denial whatever, that decedent was removed from the Mesa Sanitarium without her release either by Dr. Frazier or Mrs. Lauck and against their consent at a time when she was extremely ill, suffering from the effects of the operation. She was removed to the Granite Reef Rest Home as above stated and Dr. Frazier's secretary was refused permission to see her there. Up to the time of her removal Dr. Frazier had fully performed his part of said contract. By her removal by her sister Dr. Frazier was prevented from further performance of his contract and under the law will be deemed to have fully performed such contract. LaRue's Committee v. Williams, 211 Ky. 398, 277 S.W. 462.

[9] A good title having vested in Dr. Frazier by virtue of the deed from decedent to the O'Donnells as a conduit for vesting title in Dr. Frazier, we hold that he had the legal right to improve the property involved in this litigation and intervenor cannot complain nor is it entitled to damages therefor.

■ There is no evidence of the value of the household furnishings removed from the home of decedent or of any value in excess of $50 and we further hold that decedent authorized its removal and disposal. At the time Dr. Frazier entered into his agreement with decedent it was not anticipated by him or by her that an operation would be performed because of her age and physical condition and none would have been performed except for the interference of decedent's brother who insisted upon its performance as soon as possible. The operation entailed an expense of over $700 which exceeded the amount received by Dr. Frazier from the insurance policy carried by decedent.

We, therefore, hold it was proper for Dr. Frazier to use the proceeds of the insurance policy to defray the cost of such operation. We reach this conclusion because both the direct evidence and the circumstances surrounding the consummation of the contract between Dr. Frazier and decedent conclusively prove that Dr. Frazier was correct in advising against the operation. The operation disclosed the extent and magnitude of the tumor and its cancerous condition, which Dr. Wood stated had already

affected the liver. The evidence is likewise conclusive that the surgery would not have taken place except for the insistence of Skeen.

No one knows whether the operation shortened or prolonged her life, but it is certain it added greatly to her suffering and certainly it was against her wishes according to Dr. Frazier who testified that it required several days after her brother insisted that it be performed by Dr. Wood for him to persuade her to undergo it.

The judgment of the trial court is reversed and remanded with directions that judgment be entered for Dr. V. E. Frazier and against the intervenor, First National Bank, quieting title in the above described real estate in him and that the judgment for $500 damages against him be and the same is hereby set aside.

UDALL, V. C. J., and STRUCKMEYER, J., and FRED J. HYDER, Judge, concur.

NOTE: The Honorable CHARLES C. BERNSTEIN being disqualified and the Honorable LORNA E. LOCKWOOD did not participate, the Honorable M. T. PHELPS, Justice (Retired) and the Honorable FRED J. HYDER, Judge of the Superior Court of Maricopa County were called to sit in their stead.

JENNINGS, Justice (specially concurring).

Although I concur in the result of this case, I cannot agree with the reasoning of the majority in reaching that result. The majority state "we have read and reread the transcript of the evidence and the deposition of Dr. Frazier and we can find no direct evidence whatever even tending to prove fraud, duress, undue influence *or a failure of consideration * * * nor can we find any evidence * * * that the procurement of said deed of conveyance was part of a scheme or design to defraud decedent out of her property, and there is no circumstantial evidence at the time the transaction took place to support such claims or any of them."* (Emphasis original.)

In my opinion the record is replete with evidence of a scheme or design to defraud decedent out of her property. A review of the record reveals the following: Dr. Frazier was called to decedent's home December 27, 1954. The following day he had her removed to the Mesa Sanitarium. Dr. Frazier then notified decedent's brother, T. P. Skeen (by letter dated January 1, 1955), of decedent's condition. By January 4, 1955 decedent had told Dr. Frazier that she had no way of paying her medical and hospital expenses other than by selling her home. She was very concerned about how she would pay for her medical expenses as well as her living expenses. On January 5, 1955, Dr. Frazier received a letter from Mr. Skeen in reply to his letter of January 1,

1955, the pertinent part of which reads as follows:

"Kindly see to it that Mrs. Johnson is provided every comfort that she may desire or accept, *and I will see to it that the expenses are paid. Do not, however, communicate to her the fact that I am making this offer,* as she is extremely independent and may refuse assistance \* \* \*.

"If you know or can \* \* \* ascertain what her real circumstances are, I would appreciate your advising me as to the same, *as it will enable me to make proper provisions for her."* (Emphasis mine.) [1]

On January 17, 1955, Dr. Frazier addressed a letter to Mr. Skeen stating that he was doing so "without your sister's knowledge or consent." It read in part:

"As you said we have found Electa decidedly independent \* \* \*.

*"Finances have been our big problem.* \* \* \* We had sought to liquidate her home on a basis that would guarantee her care for as long as she should live. This was blocked by the Welfare Department, who insisted upon a cash sale at their appraisal of $1700.00, or else her $70.00 pension would be stopped. There is no prospect that such a sale

could be realized, *so no doubt the property will remain idle indefinitely, and in the end pass to the state.*

"We have thus been forced to transfer her to the County Hospital status. *Probably she can be retained at their expense in her present location.* If so it will not be possible to provide her the level of care that is possible on a private status. *In event you care to supplement the county allowance,* say to the extent of fifty dollars a month we will arrange to maintain her essentially as she has been in the past two weeks.

*My fee up to this point is $153.00, and will henceforth be somewhat less, for all the diagnostic work is now over.* \* \* \* Anything you can send me on account will be greatly appreciated."

(Emphasis mine.)

A deed was executed by decedent on February 8, 1955 which conveyed the real estate involved in this litigation to the O'Donnells [2] who acted as strawmen for Dr. Frazier. This was done pursuant to the alleged contract whereby it was to be payment for "professional care" (to the limit of Dr. Frazier's personal ability), room and board for as many days, months, or years as decedent should survive in the Mesa Sani-

1. This offer to "see to it that the expenses are paid" constituted an original promise upon which Skeen could be held legally liable.

2. Malcolm F. O'Donnell and Sarah Elizabeth O'Donnell, brother-in-law and sister of Dr. Frazier.

tarium.[3] The O'Donnells executed a deed conveying the property to Dr. Frazier on February 26, 1955.[4]

Decedent was operated on February 14, 1955 and on February 16, 1955 Skeen wrote Dr. Frazier stating that he and his brothers would send the money down at once.[5] Then on February 19, 1955 Skeen again wrote Dr. Frazier stating:

"I am enclosing my check for $100 to meet any temporary small expenses you are put to, and I ask you to send me an itemized statement of all expenses that Dr. Wood estimated to be about $700 * * *.

"I assume you will keep her in the rest home for some considerable time, and we would like also to have a statement of just what the expenses in the home will be in excess of her pension."

Dr. Frazier replied to the above letter on February 24, 1955 in which he enclosed a statement which included billing for the hospital, doctors, and Mesa Sanitarium.[6]

He stated that his fee ($351.70) covered *all that he had done for decedent to date including assistance at surgery and assistance with her affairs.* Then on March 14, 1955 Dr. Frazier wrote Skeen in which he stated:

"I should like to call your attention to the fact that she [decedent] was obliged to sign a 30-day note to the Southside District Hospital, and that this note is due March 18. Also I am embarrassed with Dr. Wood and Dr. Troutman, the anesthetist. *Mrs. Lauck [Mesa Sanitarium] is continuing to extend additional credit each day on her account, which she is not well able to do.* * * * I might also like to add that *I have a fee which is continuing to grow.* Your prompt attention to these matters will be most greatly appreciated, since the delay is leaving me in a difficult and unpleasant predicament." (Emphasis mine.)[7]

In my opinion the above facts manifest a scheme on the part of Dr. Frazier to have

3. According to the doctor's own testimony the agreement between the doctor and decedent was not entered into until the last of January or early February.
4. There was a delay in recording the deeds —the first deed not being recorded until sometime after the execution of the second deed.
5. This letter was in reply to a letter sent by Dr. Frazier.
6. The statement listed the following charges:

| Hospital Bill | $330.70 |
| Dr. Wood (surgeon) | 300.00 |
| Dr. Troutman (anesthetist) | 55.00 |
| Dr. Frazier | 351.70 |
| Mesa Sanitarium | |
| 2/8–2/12 @ $5.00 | 20.00 |
| Drugs | 5.00 |
| 2/18–2/24 @ $8.00 | 48.00 |
| | $1110.40 |
| Less $100.00 | $1010.40 |

7. On February 25, 1955 Dr. Frazier submitted a claim on decedent's health and accident policy to Pioneer American Insurance Company and on April 4, 1955 was paid $665.35, the whole of which was deposited in his personal account.

decedent's family pay for her medical and living expenses while he fraudulently appropriated her property for his own purposes. The doctor knew decedent was concerned about paying her own way without help from her family. In addition, he knew the family wanted to provide for her without her knowledge. Thus, the stage was set for the present litigation. I do not doubt, as stated by the trial judge, "that the doctor when this *first commenced* [8] had any idea of defrauding anybody." But, as the events progressed the opportunity presented itself for the doctor "to obtain the real estate * * * without consideration" as stated in the court's finding of fact No. 3. As events progressed the doctor became aware that "neither hand knew what the other was doing." [9] The decedent did not want her family to know that she was going to convey her property to the doctor in order to provide for herself. Decedent's family did not want her to know that they were making the arrangements to pay for her expenses. This presented an opportunity for the doctor to obtain the decedent's property without consideration. Although the trial judge said during the course of the trial " * * * I am not inferring that the doctor when this first commenced had any idea of defrauding anybody * * * and

I find no fraud", finding of fact No. 3 states " * * * the said deed was drafted and recorded in furtherance of a scheme and design on the part of the defendant to obtain the real estate * * * without consideration and under the circumstances * * * said deed was made to run to the defendant * * * in furtherance of said scheme to defraud * * * [decedent] of said property." In my opinion there is ample evidence in the record to support this finding. The statement made by the judge during the course of the trial was made before he had heard all of the evidence.

The majority "believe the consideration of these letters [Dr. Frazier's] by the learned trial judge constituted the basic error which led him astray." I do not agree. These letters aid in determining the intent of Dr. Frazier at the time he entered into the agreement with the decedent. The letters indicate a scheme to defraud from the beginning. For, if Dr. Frazier was arranging with decedent to provide for her needs (medical, board, room, etc.), why then did he attempt to collect from decedent's family for the same services. I think there was not only "any evidence" but that there was reasonable evidence that the procurement of the deed of conveyance was

8. Prior to the consummation of the agreement.
9. In all the doctor's dealings with the decedent's family he never once mentioned the fact that he had discussed with decedent a method whereby she would be provided for for life in return for the conveyance of her property to the doctor even after the deed had been executed. Whenever the subject matter of decedent's property was brought up Dr. Frazier professed ignorance.

part of a scheme or design to defraud decedent out of her property.

However, it is elementary that fraud without damage is not actionable. In re McDonnell's Estate, 65 Ariz. 248, 179 P.2d 238 (1947); Moore v. Meyers, 31 Ariz. 347, 253 P. 626 (1927). In order to secure relief on the basis of fraud the person seeking redress must have been damaged, injured or harmed as a result of the asserted fraud. Benson v. Garrett Investment Company, Inc., 135 Cal.App.2d Supp. 853, 287 P.2d 405 (1955). Inasmuch as the decedent received essentially what she bargained for she was not injured by the scheme to defraud. For that reason, I concur in the result of this case.